**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**
**CIVIL NO. 06-3161 (PAM/AJB)**

---

KAWASKII ANTONIO BLANCHE,
Petitioner,
vs.

AMY KLOBUCHAR and
DAVID C. BROWN,
Respondent.

---

**STATE'S MEMORANDUM**

TO: THE HONORABLE ARTHUR J. BOYLAN, UNITED STATES MAGISTRATE JUDGE.

## PROCEDURAL HISTORY

Petitioner "Kawaskii Blanche was tried and found guilty of first-degree murder, second-degree murder (drive-by shooting), conspiracy to commit murder, and of committing a crime for the benefit of a gang in connection with the June 2, 1996 murder of 11-year-old Byron Phillips. Phillips was shot while sitting on the front porch of his Minneapolis home when a bullet fired from a passing car hit him in the chest. On April 12, 1999, Blanche was sentenced to life in prison for murder, plus additional consecutive sentences for other convictions." Order of the Minnesota Supreme Court filed December 18, 2003, A03-0826 (hereinafter "Order")(Respondent's Appendix 24-27); *See as supporting documentation* Certified Copies of Verdicts of Guilty dated 3/26/99 (Respondent's Appendix 1-4); Certified Copy of Judgment dated April 12, 1999 (Respondent's Appendix 5); Certified Copy of Warrant of Commitment dated April 12, 1999 (Respondent's

Appendix 6); Certified Copy of Sentencing Transcript (Respondent's Appendix 7-23).

"Blanche did not file a direct appeal and his conviction became final on July 12, 1999." *State v. Blanche*, 696 N.W.2d 351, 363 (Minn. 2005)(Respondent's Appendix 28-58).

Petitioner waited over three years to file a petition for post-conviction relief in state court. "On December 3, 2002, Blanche filed a petition for postconviction relief under Minn. Stat. §§ 590.01 and 590.02 (2002)." Order (Respondent's Appendix 24). Blanche claimed that he was entitled to a new trial based on a state's preemptory challenge, violation of his confrontation rights in the admission of a co-defendant's statements, improper joinder of defendants, admission of gang-expert testimony, prosecutorial misconduct, and ineffective assistance of counsel. *Id*.

On May 26, 2005, the Minnesota Supreme Court issued a decision affirming the postconviction court's denial of relief. *State v. Blanche*, 696 N.W.2d at 380.

On July 31, 2006, over seven years after his conviction became final, Petitioner filed the instant Petition under 28 U.S.C. § 2254. Petitioner seeks relief on four grounds: 1) Joinder of offense; 2) Prosecutorial misconduct; 3) Sentencing; and 4) Ineffective assistance of counsel.

Respondent asserts the affirmative defense that Petitioner's habeas claims are time barred by 28 U.S.C. 2244(d)(1).

**STATEMENT OF FACTS**

A habeas court presumes that state court findings of fact are correct and will reverse only if they are not supported by the record. *Winfield v. Roper*, __ F.3d __, 2006 WL 2404058, *6 (8th Cir. Aug. 22, 2006)(citing *Whitehead v. Dormire*, 340 F.3d 532, 536-37 (8th Cir. 2003)); *see also* 28 U.S.C. 2254(e)(1)(creating a presumption that state court factual findings are correct unless rebutted by clear and convincing evidence). The Minnesota Supreme Court, in its decision affirming the denial of postconviction relief, detailed the facts relevant to this proceeding as follows:

> At around 6:15 p.m. on June 2, 1996, 11-year-old Byron Phillips was playing with his cousin and a friend on the front porch of the friend's North Minneapolis home. While Phillips was playing, a bullet fired from a passing car hit him in the chest. Phillips died at the scene as a result of the shooting.
>
> Phillips' cousin and friend both stated that the passing car was driven by an African American male, who appeared to be in his teens and who wore a baseball type cap. The cousin and the friend disagreed on other details about the driver and they could not remember how many other people may have been in the car. The cousin testified that the car was a full-size blue car with rust spots, but the friend testified that he had seen a full-size red car with rust spots. Neither of the boys was ever asked to identify any individuals or cars in a photographic line-up.
>
> The police recovered ten 9-mm shell casings on a street just west of Phillips' home and some bullet fragments in the surrounding area. Bullets had hit nearby bushes and had gone through the wall of a garage. Forensic evidence showed that seven of the ten shell casings found at the scene had been fired from

the same gun and matched shell casings found at the scenes of three recent shootings that had occurred in Minneapolis and Saint Paul on May 17, May 31, and June 1. Witness testimony indicated that these shootings were the result of a feud between two rival gangs: the “Bogus Boyz” and the “Shortys Taking Over” (“S.T.O.”).

On May 17 in Saint Paul, Caylon Williams, a member of the Bogus Boyz, shot Richard Smaller. S.T.O. member Corey Scott shot Bogus Boyz member Robert Williams on May 31 in Minneapolis, but did not cause him serious injury. Robert Williams testified that he fired back at Scott with a gray 9-mm Smith & Wesson semi-automatic handgun that he had found in Caylon Williams' car. Robert Williams was admitted to the hospital with wounds to his face and right arm, and was released the next day. On June 1 in Minneapolis, Caylon Williams, while armed with the same gray 9-mm Smith & Wesson used by Robert Williams, was shot and seriously wounded by Scott. Blanche had been a passenger in Caylon Williams' car. When Caylon Williams was shot, Blanche took over as driver and drove Caylon Williams to the hospital. Robert Williams testified that later that same day, he, Blanche, and some others discussed killing Scott in retaliation for the shooting of Caylon Williams.

Around noon on June 2, Blanche, Montay Bernard, David Allen, and Robert Williams set out to visit Caylon Williams in the hospital. They were driving there in a maroon Nissan Maxima owned by Bernard's mother. Before going to the hospital, Blanche wanted to drive through a part of North Minneapolis near where Scott lived. As they drove through this neighborhood, the four spotted Scott walking down the sidewalk. Williams and Allen got out of the car in an attempt to go after Scott, but they were stopped by police officers responding to a call that there was a man in the area with a gun. The officers arrested Williams and charged him with being a felon in possession of a handgun. Allen was detained, but was released a short time later that day. Blanche and

Bernard drove off when Williams and Allen were detained. Later that day, at approximately 6:15 p.m., Phillips was shot and killed.

The police investigation of Phillips' shooting led them to interview Blanche, but he was not charged at that time. The police had several leads, including the shell casings from the gang-related shootings, but the investigation stalled, and no one was charged with Phillips' murder.

More than a year after the shooting, in July 1997, a woman named Vanessa Gaines came forward with information about Phillips' shooting. Gaines had seen a billboard near her house with a picture of Phillips and a message which read: “You know who killed me. Why won't you help?” Gaines called the police, but hung up the first two times that she called. She testified that she eventually told the police that sometime between 6:00 and 9:00 p.m. on June 2, 1996, she saw her nephew Duan Gaines at her home, talking to Blanche and Bernard. She had not known Bernard's name on June 2, but she identified him at trial. She had recognized Blanche on June 2 because he would hang out with her nephew.

Gaines testified that she overheard the three men talking. She heard Blanche mention a shootout in North Minneapolis with S.T.O. gang members and state his belief that a little boy had been hit with a bullet because he saw the boy fall to the ground. She also saw that Blanche was carrying an automatic handgun. Later that same evening, she saw on the news that a little boy had been killed in a North Minneapolis shootout. At trial, Gaines admitted that she has several criminal convictions and had received reward money for the information that she provided, but she denied that the reward was the reason for her testimony.

In August 1997, Robert Williams told Minneapolis Police Detective David Zimmer that he knew something about the Phillips shooting. Robert

Williams, who was incarcerated when he spoke to Zimmer, initially did not talk about Blanche's involvement in the shooting when he first spoke to Zimmer in June 1997. Later, Robert Williams contacted Zimmer through his friend, Caylon Williams, and requested that Zimmer come to see him. Robert Williams then implicated Blanche and Bernard in Phillips' murder, telling Zimmer that Blanche had said that he and a friend were "rolling over north [Minneapolis]" and bumped into Scott. According to Robert Williams, Blanche said that he only drove the car, that his friends started shooting at Scott, and that this was the incident where Phillips was killed. In return for his testimony, the state granted Williams immunity from being prosecuted for the Phillips shooting and the conspiracy to kill Scott.

After receiving the information from Vanessa Gaines and Robert Williams, the police arrested Blanche and Bernard for Phillips' murder. Both Blanche and Bernard were charged with first-degree murder under Minn. Stat. § 609.185(1) (2004), second-degree murder (drive-by shooting) under Minn. Stat. § 609.19, subd. 1(2) (2004), conspiracy to commit murder (Corey Scott) under Minn. Stat. § 609.175, subd. 2(2) (2004), and crime committed for the benefit of a gang under Minn. Stat. § 609.229, subd. 2 (2004). Allen was also arrested, but he was charged only with conspiracy to commit murder under Minn. Stat. § 609.175, subd. 2(2). On June 30, 1998, a grand jury indicted all three for the foregoing charges. The state then moved to join the trials of Blanche, Bernard, and Allen under Minn. R. Crim. P. 17.03 and Minn. Stat. § 631.035 (2004). Blanche, Bernard, and Allen each opposed a joint trial. The district court granted the state's motion to join the trials of Blanche and Bernard, but denied the state's request to join Allen's trial. Blanche and Bernard were tried together in March 1999.

* * *

*Robert Williams' Testimony and Letter*

The state called numerous witnesses who testified that Blanche and Bernard told them about their involvement in the Phillips shooting. Among those witnesses was Robert Williams, who identified himself as a Bogus Boyz gang member at the time of the shooting. Williams testified about the information that he had previously given the police which implicated Blanche and Bernard in Phillips' murder. On cross-examination by Bernard's counsel, Williams admitted that while in prison in September 1997, he wrote a letter to Blanche. Bernard moved for admission of the letter without objection. In the letter, Williams told Blanche that the "feds" had been investigating the Bogus Boyz and knew "about the little boy and everything." Williams wrote that he did not want to do any time in prison and that he "told [the police] what [he knew] so Montae [sic] will only go down for that [crime]." Later, Blanche's counsel also cross-examined Detective Zimmer about the letter. Zimmer admitted that Williams' letter to Blanche was written in his presence and with his help, and that the letter's content was designed to lead anyone who read it to believe that Blanche knew what Williams was talking about, despite its vague reference to the shooting.

*Bernard's Statements*

The state also called witnesses to testify to incriminating statements made by Bernard. Monta Davis, who is both Robert Williams' cousin and related to Phillips, testified that he had been a member of another gang, but had hung out with members of the Bogus Boyz. Davis testified that in February 1998, while he and Bernard were in the "workhouse," Bernard admitted to him he was involved in Phillips' death-that "him and one of his friends" had "got into a shoot out" with Scott while Bernard drove his mother's car. Davis testified that Bernard told him that Scott had been the intended target, but that a friend named Jamoke Jackson had told Bernard that a little boy had been killed instead. According to Davis, Bernard also

told him that he had been shooting a 9-mm "high point" gun and his friend was using a gray 9-mm Smith & Wesson. After the shooting, Bernard and his friend went to Allen's house in North Minneapolis and then to Peavey Park in South Minneapolis.

Detective Charles Kelly likewise testified that in his interview with Davis, Davis had told him of Bernard's statements about the shooting. Kelly also stated that he had no independent verification of the content of conversations between Davis and Bernard nor any proof that they took place.

*Other Witnesses*

Duan Gaines testified that in 1996 he was a member of the Bogus Boyz gang and that, on the night before Phillips was shot, he had been involved in a plan to shoot Scott. But in response to the state's questions, Gaines recanted much of his earlier grand jury testimony. Gaines admitted that he had testified to the grand jury and told Detective Zimmer in 1998 that on the evening Phillips was shot, Blanche and Bernard had come to his aunt's house and asked for a change of clothes. But at trial, Gaines stated that no one had come to his aunt's house on June 2 and that his testimony to the grand jury was what his attorney had told him to say. Gaines also denied the truth of his previous grand jury testimony where he stated that, during a conversation in Peavey Park shortly after Phillips' murder, Blanche said, "I wasn't the only one shooting." Over objections by both Blanche and Bernard, the state elicited from Gaines that in 1998 he told Zimmer that Bernard had said to Blanche, "We should have got out. You saw whoopty fall." Blanche responded, "Nathan, I'm dumping on Snyp. You saw he was dumping back." Earlier, Gaines had testified that "Snyp" was a nickname for Caylon Williams.

Another witness, whose testimony has not been challenged by Blanche on appeal, testified that a "couple [of] days" after Phillips was shot, this witness overheard Blanche tell Gaines to "keep his mouth

shut," that Gaines should not "be running around here telling females that, * * * we had shot this little kid; that we supposed to have been the one that shot the little kid." This witness was also a Bogus Boyz gang member with multiple felony convictions.

Another witness, Sid Strickland, whose direct testimony has also not been challenged in this appeal, testified that while he was in prison, Blanche told him that "they had gotten into some problems with [Scott]. And when they seen him, they shot at him, and a little boy ended up wounded, got shot." Strickland also testified that Blanche admitted to him that, when the incident took place, he had the "9"-a 9-mm handgun. On cross examination, when Blanche's counsel was attempting to discredit his testimony, Strickland spontaneously said, "[Blanche] sold bags to me and numerous amounts of things." Blanche's counsel did not object to Strickland's comment. Strickland also admitted that he testified because of an agreement that could help him get a reduction in his sentence for a separate crime.

* * *

*Videotaped Statements of Blanche and Bernard*

The state introduced as evidence a videotape containing excerpts from separate interviews investigators conducted with Blanche and Bernard. The videotape was played for the jury with instructions to the jurors that they could consider Bernard's and Blanche's statements only as they related to each defendant's own case and not the other's case. Part of the videotape contained a statement by Bernard that had been redacted shortly after the point when detectives asked him whom he picked up in his car on the morning of June 2, 1996. Bernard says "Robert Williams"; the tape then skips and the next words Bernard says are "David Allen." During jury deliberations, the jurors sent the following note to the district court: "We noticed that a name was edited out of the Montay Bernard's video testimony statement to

the police. Would this normally be done so as not to implicate the other defendant?" The record indicates that in response to this inquiry, the court sent the jury the following note: "Any editting [sic] on the tape was done at the direction of the court according to the rules of law. And you should not concern yourself with it."

*Adjudication and Sentencing*

The jury found Blanche guilty on all four counts-first-degree murder, second-degree murder (drive-by shooting), conspiracy to commit murder, and crime committed for the benefit of a gang. The jury found Bernard guilty of two counts-conspiracy to commit murder and crime committed for the benefit of a gang. The district court sentenced Blanche to the mandatory sentence of life imprisonment for premeditated first-degree murder, the presumptive sentence of 180 months for the conspiracy against Scott to commit first-degree murder, and added the mandatory minimum of 12 months and 1 day to his life sentence for a crime committed for the benefit of a gang. The court, making an upward sentencing departure, ordered these sentences to run consecutively to each other and consecutively to a federal sentence that Blanche was serving until April 11, 2000, for being a felon in possession of a firearm. The court stated that it chose in its discretion to make the sentences consecutive and specifically listed several factors: the existence of multiple victims, both intended and unintended; Phillips' vulnerability and complete innocence; the violation of Phillips' zone of privacy; the emotional and psychological devastation to the community of repeated random shootings in residential areas in an attempt to assassinate Corey Scott; the harm to the community resulting from the senseless and brutal killing of an innocent child; and Blanche's apparent lack of remorse and responsibility. Blanche did not file a direct appeal and his conviction became final on July 12, 1999.

*Postconviction Review*

In December 2002, Blanche filed a petition for postconviction relief. He alleged racial discrimination because the state used a peremptory challenge to strike a venire member who appeared to be “Hispanic”; Confrontation Clause violations through the admission of statements by his codefendant in their joint trial; improper joinder of his trial with the trial of his codefendant; prosecutorial misconduct; ineffective assistance of counsel; and erroneous sentencing.

The same judge who presided at Blanche's trial heard the postconviction petition. The state argued to the postconviction court that Blanche's petition was barred because all the issues raised were available during the time frame for a direct appeal and that the state would be unduly prejudiced by the delay if a new trial were granted. The postconviction court, in an Order and Memorandum filed June 11, 2003, concluded that Blanche was entitled to have the issues he raised considered on postconviction review on the ground that a convicted defendant has the right to at least one substantive review. The court also concluded that, under the circumstances of this case, the delay between Blanche's conviction and any decision on postconviction relief was not excessive enough to entitle the state to an automatic dismissal of the petition based on prejudice.

The postconviction court nevertheless denied and dismissed Blanche's petition without a hearing, concluding that Blanche was not entitled to relief. Blanche appealed and on December 3, 2003, we heard oral arguments. Following the hearing, on December 18, 2003, we remanded the issue of Blanche's ineffective assistance of counsel claim to the postconviction court to hold an evidentiary hearing. We also stayed Blanche's appeal and retained jurisdiction over the other issues.

At a hearing held July 7, 2004, Blanche called only one witness, his trial counsel, Demetrius Clemons. The

> state did not call any witnesses. Clemons testified that he did not remember many of his actions or tactical decisions he had made during the trial. The state attempted to show that Clemons' representation had not been unreasonable. After the hearing, the postconviction court determined that Blanche failed to establish that his trial representation fell below an objective standard of reasonableness and that, but for trial counsel's errors, the outcome would have been different.
>
> * * *

*State v. Blanche*, 696 N.W.2d at 358 -364.

# ARGUMENT

## I. PETITIONER'S CLAIMS ARE TIME-BARRED.

### A. The statute of limitations in the AEDPA.

On April 24, 1996, President Clinton signed the Anti-terrorism and Effective Death Penalty Act ("AEDPA"), which effected significant changes in the federal habeas corpus statutes. One of those changes included the establishment of a one-year statute of limitations for habeas corpus petitions filed by state prisoners seeking federal court review of a conviction or sentence. 28 U.S.C. § 2244(d). Under that provision:

> "(d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of-
>
> > (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
> >
> > (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
> >
> > (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
> >
> > (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

> (d)(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."

In this case, there is nothing on the face of the petition which suggests that clauses (B), (C) or (D) of § 2244(d)(1) could be applicable. In other words, there is no suggestion that the State created any impediment that prevented Petitioner from seeking federal habeas relief within the prescribed one-year limitation period, nor is there any suggestion that Petitioner's claims are based a right newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review, nor is there any suggestion that Petitioner's claims are based on any new evidence that could not have been discovered earlier.

**B. Petitioner's claims are time-barred.**

Appellant's habeas claims are therefore time-barred if he did not file his habeas petition within one year of his conviction becoming final "by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A).

Appellant was sentenced on April 12, 1999. Order (Respondent's Appendix 5-23). Under Minnesota Rule of Criminal Procedure 29.03, subd. 3, a defendant convicted of first degree murder may appeal as of right to the Minnesota Supreme Court by filing a notice of appeal "within 90 days after the final judgment." Under that same rule, "A judgment shall be considered final within the meaning of these

rules when there is a judgment of conviction upon the verdict of a jury or the finding of the court, and sentence is imposed." Minn. R. Crim. P. 29.03, subd. 3. If a defendant fails to file a direct appeal, the case becomes final 90 days after the final judgment, even if the defendant subsequently files a postconviction petition. *See State v. Blanche*, 696 N.W.2d at 378 n. 11 (Minn. 2005). In this case, because Petitioner failed to file a direct appeal, the Minnesota Supreme Court has concluded that "his conviction became final on July 12, 1999." *Blanche*, 696 N.W.2d at 363.

Petitioner's time to file a federal habeas petition expired one year after July 12, 1999 – July 12, 2000. 28 U.S.C. 2244(d)(1)(A). Yet petitioner did not file his habeas petition until July 31, 2006 - over six years after the statute of limitations expired. As such, Petitioner's claims are time barred and the petition should be dismissed without a hearing.

**C. Petitioner filed his state court postconviction proceedings after the statute of limitations under the AEDPA had expired.**

Petitioner may argue that he subsequently brought postconviction proceedings in state court and that the period for filing his federal habeas petition should therefore be tolled or reset. The habeas corpus statute of limitations is tolled pursuant to § 2244(d)(2) when a prisoner files a state postconviction motion, or otherwise seeks collateral relief, in a procedurally proper state court proceeding. The statute remains tolled during the entire period of time that such collateral

proceedings continue to be pending in any state court, including the state appellate courts. *Mills v. Norris*, 187 F.3d 881, 883-84 (8th Cir.1999).

However, the tolling provisions of § 2244(d)(2) cannot aid Petitioner here, because the statute of limitations had already expired long before he initiated his state court collateral action. Here, Petitioner's time to file a habeas petition expired on July 12, 2000. He did not bring his state court postconviction motion until "December 2002." *State v. Blanche*, 696 N.W.2d at 363. Therefore, Petitioner's postconviction proceeding in state court did not toll or revive the previously expired AEDPA limitations period. *See Painter v. Iowa*, 247 F.3d 1256 (8th Cir. 2001) (once the AEDPA's one-year limitations period has ended, exhaustion of state remedies, even if timely under state law, does not extend, toll, or reset the deadline for filing a federal habeas corpus petition; "by the time [petitioner] filed his state court application [for post-conviction relief] ··· there was no federal limitations period remaining to toll").

As explained in *Sorce v. Artuz*, 73 F.Supp.2d 292, 294 (E.D.N.Y.1999)[1]:

> "The tolling provision of AEDPA does not allow the one year period to run anew each time a post-conviction motion is ruled upon. Instead, the toll excludes from the calculation of the one year period any time during which post-conviction relief is pending. [Citation omitted.] Thus, the provision stops, but does not reset, the clock from ticking on the time in which to file a habeas petition. It cannot revive a time period that has already expired."

---

[1] Taken from *Beck v. Symmes*, 2006 WL 2502222, *3, n.3 (D.Minn. 2006)(slip copy).

> *See also Lucidore v. New York State Div. of Parole*, No. 99 CIV 2936 AJP, (S.D.N.Y.1999), 1999 WL 566362 at * 4 ("Section 2244(d) does not state that the AEDPA's one-year statute begins to run anew after decision on a state collateral attack; such an interpretation would allow an inmate to avoid the effect of the AEDPA's one-year [statute] of limitations by bringing a belated state collateral attack"), *aff'd* 209 F.3d 107 (2nd Cir.), *cert. denied*, 532 U.S. 873 (2000); *Broom v. Garvin*, 99 Civ. 1083(JSM) (S.D.N.Y. Apr. 26, 1999), 1999 WL 246753 at *1 ("the filing of a collateral attack in the state court tolls the AEDPA statute of limitations during the period that it is pending, but it does not commence a new limitations period").

The fact that Petitioner filed a state court postconviction motion in December of 2002 is of no help to him. The postconviction motion could not revive habeas claims that died two years before on July 12, 2000. The Petition here is time-barred and Respondent respectfully requests that it be dismissed without a hearing.

## CONCLUSION

Petitioner's conviction became final on July 12, 1999 and his time to file a federal habeas petition expired on July 12, 2000. Petitioner did not institute his state court postconviction proceedings until December of 2002. He did not file his federal habeas petition until July 31, 2006. Under 28 U.S.C. 2244(d)(1), Petitioner filed his federal habeas petition over six years too late and all of his claims are barred by the statute of limitations. Respondent respectfully requests that the petition be dismissed without a hearing.

DATED: September 6, 2006

Respectfully submitted,

MICHAEL A. HATCH
Minnesota Attorney General
N. Central Life Tower, Suite 1800
445 Minnesota Street
St. Paul, MN 55101-2134

AMY KLOBUCHAR
Hennepin County Attorney

s/ David C. Brown
By: DAVID C. BROWN
Assistant County Attorney
Attorney License No. 18701X
Telephone: (612) 348-4085
C-2000 Government Center
Minneapolis, MN 55487

ATTORNEYS FOR RESPONDENT